This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

 Plaintiff-Appellee,

v.             **NO. 30,514**

**MICHAEL DAVID RIVERA,**

 Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Gary K. King, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

Jacqueline L. Cooper, Acting Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**WECHSLER, Judge.**

Defendant Michael Rivera appeals his conviction for aggravated driving while under the influence of an intoxicating liquor (DWI) in violation of NMSA 1978, Section 66-8-102(A), (D)(3) (2008) (amended 2010).  Defendant raises five issues on appeal:  whether (1) the district court erred in permitting the State to introduce testimonial statements of a non-testifying forensic analyst through the in-court testimony of a supervisor, who did not perform or observe the laboratory analysis described in the statements; (2) the district court erred in finding that reasonable suspicion justified the officer in stopping Defendant's vehicle; (3) the district court erred in not finding the traffic stop pretextual; (4) the State presented sufficient evidence to convict Defendant of DWI; and (5) Defendant did not receive effective assistance of counsel.  We affirm.

**BACKGROUND**

On March 13, 2009, at approximately 11:30 pm, Officer TJ Brown, who had been with the Bloomfield Police Department for seven years, was on routine patrol in Bloomfield, New Mexico.  While on patrol, he observed a vehicle with two occupants driving through a neighborhood on North First Street.  Officer Brown's attention was drawn to the vehicle because (1) it pulled into the apartment complex with two occupants and then got back onto the road with two people still in the vehicle; (2) the vehicle was traveling about five miles an hour under the speed limit, whereas most

people drove over the speed limit on that road; and (3) the vehicle was weaving within its lane. Officer Brown suspected the driver of the vehicle to be driving while under the influence. Officer Brown testified that he noticed the vehicle driving through a neighborhood on a road that ran parallel to U.S. 64, the main road through town, instead of taking U.S. 64. In Officer Brown's experience, people avoid using the main road in an effort to avoid coming into contact with him.

Officer Brown knew that Officer Michael Carey was on duty in Aztec, the adjacent city, and called him on his cell phone and told him that he was following a suspicious vehicle. Officer Brown was concerned, but he wanted more than just reasonable suspicion to support a traffic stop. Officer Brown followed the vehicle in a police-issued unmarked Ford Expedition for about three miles. When he reached Aztec, he saw Officer Carey and signaled to him that they were approaching. Officer Brown pulled into the median to turn around. As he was doing so, he saw Defendant's vehicle swerve halfway over the white line and into the shoulder of the road. Officer Brown told Officer Carey what he had just observed. Officer Brown activated the camera on his vehicle, but the lighting conditions and the road grade were such that one could not distinguish the white line and the vehicle on the video recording.

Officer Carey testified that his duties were to patrol the city, to investigate

crimes, and to make traffic stops for infractions. Officer Carey was in a marked patrol unit, wore his full uniform, and displayed his badge of office. Officer Carey testified that on the evening of March 13, 2009, Officer Brown called him and told him that he had observed a suspicious vehicle and that it had crossed the white line. Officer Carey stopped the vehicle for crossing the white line. Officer Carey approached the driver side of the vehicle and immediately smelled alcohol coming from within the vehicle. Defendant claimed that he had not been drinking. Officer Carey observed that Defendant had watery eyes and slightly slurred speech. He testified that he had received training in DWI investigations, including the administration of field sobriety tests, and had conducted over one hundred DWI investigations. He administered three tests to Defendant: the one-leg stand test; the walk-and-turn test; and the finger dexterity test. He did not believe that he asked Defendant if he had any physical disabilities that would impair his ability to perform the tests. He testified that Defendant appeared to have a lazy eye. According to Officer Carey, Defendant failed to properly perform the walk-and-turn test in that he did not count aloud, did not touch heel to toe, stopped on the ninth step of the test, had to be told to turn and return, and stepped off the line. He testified that during the one-leg stand test Defendant exhibited two signs of intoxication: he used his hands for balance and put his foot down after beginning the test. During two of the three times that the officer had

4

Defendant perform the finger dexterity test, Defendant did not count correctly and then did not correctly count with the designated finger.

Based on Defendant's physical appearance, the strong odor of alcohol, and his performance on the field sobriety tests, Officer Carey placed Defendant under arrest for DWI. Officer Carey advised Defendant of the Implied Consent Act (ICA) advisory. Defendant refused to give a breath sample and began to argue with Officer Carey. Officer Carey obtained a search warrant for a sample of Defendant's blood and transported Defendant to the hospital. Defendant stated that he was not going to let them take his blood and would fight them. Defendant resisted the nurse's efforts to insert the needle for the drawing of the blood sample and resisted even more when an assisting officer tried to hold him. Officer Carey threatened to use his taser and Defendant then allowed the blood sample to be drawn.

**CONFRONTATION CLAUSE AND FUNDAMENTAL ERROR**

Defendant argues that the admission of Form 705 of the New Mexico Department of Health Scientific Laboratory Division (SLD) into evidence violated his rights under the confrontation clause. He asserts on appeal that his timely hearsay objection was sufficient to preserve this argument. Alternatively, Defendant argues that the admission of Form 705 rose to the level of fundamental error.

"To preserve a question for review[,] it must appear that a ruling or decision by

the district court was fairly invoked." Rule 12-216(A) NMRA. An objection must be made with "sufficient specificity to alert the mind of the trial court to the claimed error" to invoke the ruling of the court upon a question or issue. *State v. Lopez*, 84 N.M. 805, 809, 508 P.2d 1292, 1296 (1973). Defendant's objections regarding the admission of Form 705 into evidence, while timely, were insufficient in terms of specificity.

At trial, the State called Gerasimos Razatos, who works for the SLD Toxicology Bureau as a drug screening supervisor. The district court recognized him as an expert. Razatos testified that in this particular case he was also the reviewer of the blood alcohol analysis performed by Amy Egbert, that he double checked everything to make sure that all standard operating procedures were followed, and that there were no transcription errors. Razatos testified that he then signed off on the form to indicate that the work was performed in accordance with laboratory regulations. The State moved Form 705 into evidence, and Defendant objected on hearsay grounds. The court overruled the objection.

Defendant did not base his objection on confrontation clause grounds, and, instead, he objected to the testimony at issue on hearsay grounds. In *State v. Lucero*, 104 N.M. 587, 591, 725 P.2d 266, 270 (Ct. App. 1986), we held that the defendant did not preserve a confrontation clause issue by objecting on hearsay grounds. *See State*

6

*v. Silva*, 2008-NMSC-051, ¶ 10, 144 N.M. 815, 192 P.3d 1192 (holding that a confrontation clause claim will not be preserved for appeal unless the objection during trial is made with sufficient specificity). Therefore, Defendant's hearsay objection did not properly preserve his confrontation clause issue, and we review only for fundamental error. *See id.* ¶ 11.

"A fundamental error occurs where there has been a miscarriage of justice, the conviction shocks the conscience, or substantial justice has been denied." *State v. Dietrich*, 2009-NMCA-031, ¶ 52, 145 N.M. 733, 204 P.3d 748. This Court may also "conclude that a fundamental error has been committed upon a determination that a trial court's error was of such magnitude that it affected the trial outcome." *Id.* (internal quotation marks and citation omitted). The jury found Defendant guilty of aggravated DWI under an impairment theory. To support Defendant's conviction, the State presented evidence demonstrating that Defendant's driving was impaired such that he was driving under the speed limit, weaving within his lane and out of his lane; he smelled strongly of alcohol; his eyes were watery; his speech was slurred; he had poor balance during the field sobriety tests; he was unable to follow the field sobriety test instructions; he refused to comply with the ICA; and he was combative at the hospital. Based on this evidence, we cannot say that Defendant's conviction "shock[ed] our conscience," and, therefore, we decline to conclude that a fundamental

error has occurred. *See id.*

**REASONABLE SUSPICION AND PRETEXTUAL STOP**

**Standard of Review**

Defendant argues that the district court erred by denying his motion to suppress the evidence obtained as a result of the traffic stop arguing that both officers lacked reasonable suspicion at the inception of the stop, or, alternatively, that if reasonable suspicion existed, the stop was pretextual under *State v. Ochoa* (*Ochoa II*), 2009-NMCA-002, 146 N.M. 32, 206 P.3d 143.

Because suppression of evidence is a mixed question of law and fact, we apply a two-part review to a district court's decision regarding a motion to suppress. *See State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856. We determine "whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *Id.* (internal quotation marks and citation omitted). In doing so, we defer to the district court's findings of facts to the extent they are supported by substantial evidence. *Id.* We "review the application of the law to these facts, including determinations of reasonable suspicion, under a de novo standard of review." *State v. Patterson*, 2006-NMCA-037, ¶ 13, 139 N.M. 322, 131 P.3d 1286.

**Reasonable Suspicion**

Defendant argues that Officer Brown admitted that he did not see any traffic violations for the entire time he followed Defendant through Bloomfield and it was not until Office Brown was turning around as Defendant approached Aztec, that he saw Defendant's vehicle swerve half way out of its lane of traffic and onto the shoulder of the road. Defendant notes that the jury found Officer Brown's testimony was not credible, because it acquitted Defendant of the failure to maintain traffic lane charge. Finally, Defendant asserts that Officer Carey, the arresting officer, did not see any violation whatsoever. Thus, according to Defendant, both officers lacked reasonable suspicion to justify the seizure of Defendant, and the district court should have suppressed the evidence illegally gained from this stop.

Defendant was "seized" at the moment when Officer Carey stopped Defendant's vehicle. *See State v. Duran*, 2005-NMSC-034, ¶ 33, 138 N.M. 414, 120 P.3d 836 (holding that "[o]nce a motorist is stopped, he or she is seized under the Fourth Amendment because his or her freedom is curtailed by official police action"), *overruled on other grounds by State v. Leyva*, 2011-NMSC-009, 149 N.M. 435, 250 P.3d 861. We therefore address whether the officer had reasonable suspicion to seize Defendant at the inception of the stop. *See Duran*, 2005-NMSC-034, ¶ 34.

An "[i]nvestigatory detention is permissible when there is a reasonable and articulable suspicion that the law is being or has been broken." *Jason L.*, 2000-

NMSC-018, ¶ 20 (internal quotation marks and citation omitted). Reasonable suspicion is defined as "a particularized suspicion, based on all the circumstances that a particular individual, the one detained, is breaking, or has broken, the law." *Id.* "Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts." *State v. Flores*, 1996-NMCA-059, ¶ 7, 122 N.M. 84, 920 P.2d 1038. "Unsupported intuition and inarticulable hunches are not sufficient." *Jason L.*, 2000-NMSC-018, ¶ 20 (internal quotation marks and citation omitted).

Looking at the totality of the circumstances, Officer Brown had a particularized suspicion that Defendant was breaking, or had broken, the law at the inception of the traffic stop. Our Supreme Court has stated that a police officer may stop a vehicle if the officer has an objectively reasonable suspicion that the motorist has violated a traffic law. *State v. Vandenberg*, 2003-NMSC-030, ¶ 21, 134 N.M. 566, 81 P.3d 19. In this case, Officer Brown's observation of Defendant's vehicle swerving half way out of its lane of traffic and onto the shoulder of the road supported a reasonable belief that the driver failed to maintain his lane, contrary to NMSA 1978, Section 66-7-317 (1978). Officer Brown immediately reported his observation of Defendant's traffic violation to Officer Carey. Officer Carey relied on Officer Brown's observation and stopped Defendant for driving out of his lane of traffic. Officer Carey's stop of

Defendant was reasonable because an officer may reasonably rely on information from another officer that a crime has been, or is being, committed. *State v. Ochoa* (*Ochoa I*), 2008-NMSC-023, ¶ 21, 143 N.M. 749, 182 P.3d 130. Defendant's weaving within his lane of traffic, driving under the speed limit, avoiding the main thoroughfare through Bloomfield, and driving half way over the white line also provided the officers with reasonable suspicion to believe that as a result of consuming alcohol or drugs, Defendant was less able to the slightest degree to safely operate a vehicle. *See* § 66-8-102(A).

Thus, at the point Defendant was seized, Officer Brown already had observed specific articulable facts that, when viewed objectively, would lead to reasonable suspicion that Defendant had broken the law based on observing a traffic code violation and suspicion of DWI. *State v. Hubble*, 2009-NMSC-014, ¶ 35, 146 N.M. 70, 206 P.3d 579 (holding that reasonable suspicion existed for a traffic stop when the officer had observed the defendant violate the turn signal statute); *Vandenberg*, 2003-NMSC-030, ¶ 21 (stating that reasonable suspicion existed for a traffic stop based on the defendant's speeding in a construction zone); *State v. Prince*, 2004-NMCA-127, ¶ 11, 136 N.M. 521, 101 P.3d 332 (determining that reasonable suspicion existed for a traffic stop when the officer observed the defendant driving in excess of the speed limit).

11

**Pretextual Stop**

Defendant also contends that the traffic stop was illegal because it was pretextual under *Ochoa II*. He argues that Officer Brown "wanted to launch a DWI investigation, and used the failure to maintain traffic lane as the means to do so." The district court concluded that Officer Brown's decision to initiate a traffic stop based on Defendant's crossing the line into the shoulder was not a pretext to investigate a DWI.

In *Ochoa II,* a narcotics officer was investigating a residence for drug activity and the presence of the defendant's vehicle at the residence. *Id.* ¶ 44. The narcotics officer did not issue traffic citations as a part of his duties. *Id.* He testified that he wanted to identify and question the defendant. *Id.* The narcotics officer called a uniformed patrol officer on the radio to see if a patrol officer would pull the defendant over. *Id.* On the sole basis of the radio call, the patrol officer followed the defendant for approximately thirteen blocks and stopped him. *Id.* The windows on the defendant's vehicle were tinted and, as a result, the patrol officer could not determine whether the defendant was wearing a seat belt. *Id.* Nevertheless, because of the narcotics officer's report, the patrol officer stopped the defendant. *Id.* After the patrol officer arrested the defendant because he immediately recognized the defendant as having warrants for his arrest, the narcotics officer approached the defendant and

12

began questioning him about drug activity at the residence. *Id.*

This Court departed from federal constitutional law in *Ochoa II* and held that pretextual traffic stops violate Article II, Section 10 of the New Mexico Constitution. *Ochoa II*, 2009-NMCA-002, ¶ 1. We defined a pretextual traffic stop as a "detention supportable by reasonable suspicion or probable cause to believe that a traffic offense has occurred, but is executed as a pretense to pursue a hunch, a different more serious investigative agenda for which there is no reasonable suspicion or probable cause." *Id.* ¶ 25 (internal quotation marks omitted). In determining whether a traffic stop is pretextual, we explained that the district court should first determine whether there was reasonable suspicion or probable cause for the stop and then decide if the officer's actual motive for the stop was unrelated to the justification for the stop. *Id.* ¶ 40. "The defendant has the burden of proof to show pretext based on the totality of the circumstances" and, "[i]f the defendant has not placed substantial facts in dispute indicating pretext, then the seizure is not pretextual." *Id.* However, "[i]f the defendant shows sufficient facts indicating the officer had an unrelated motive that was not supported by reasonable suspicion or probable cause, then there is a rebuttable presumption that the stop was pretextual," and the burden shifts to the state to prove that the officer would have stopped the defendant even without the alternate motive. *Id.* We explained that the facts relevant to the totality of the circumstances may

13

include, but are not limited to:

> whether the defendant was arrested for and charged with a crime unrelated to the stop; the officer's compliance or non-compliance with standard police practices; whether the officer was in an unmarked car or was not in uniform; whether patrolling or enforcement of the traffic code were among the officer's typical employment duties; whether the officer had information, which did not rise to the level of reasonable suspicion or probable cause, relating to another offense; the manner of the stop, including how long the officer trailed the defendant before performing the stop, how long after the alleged suspicion arose or violation was committed the stop was made, how many officers were present for the stop; the conduct, demeanor, and statements of the officer during the stop; the relevant characteristics of the defendant; whether the objective reason articulated for the stop was necessary for the protection of traffic safety; and the officer's testimony as to the reason for the stop.

*Id.* ¶ 41.

In this case, having already decided that the district court properly found that there was reasonable suspicion for the traffic stop based on traffic violations, we now address whether Defendant met his burden of showing pretext by presenting "sufficient facts indicating the officer had an unrelated motive that was not supported by reasonable suspicion or probable cause." *Id.* ¶ 40.

Defendant argues that the following facts establish pretext: (1) as in *Ochoa II*, the first police officer radioed another police officer to pull the driver over; (2) also as in *Ochoa II*, the second officer did not see the alleged traffic violation; and (3) the first officer did not see any traffic violations the entire time he followed Defendant through Bloomfield, but believed Defendant was driving while under the influence.

14

An analysis of the *Ochoa II* pretext indicators supports the district court's rejection of Defendant's pretext claim.

The first *Ochoa II* factor is "whether . . . [D]efendant was arrested for and charged with a crime unrelated to the stop." *Id.* ¶ 41. Officers are not precluded from observing and following an individual based on their speculation or hunch regarding potential criminal activity, so long as they do so within the confines of constitutional protections. Officer Brown did not stop Defendant immediately based on his initial observations of Defendant's suspicious behavior and instead followed Defendant to investigate further. Officer Brown's initial observations regarding Defendant being under the influence were substantiated by his further observation of Defendant committing a traffic violation, which he communicated immediately to Officer Carey. Defendant was charged with aggravated DWI; failure to maintain traffic lane; driving while license suspended or revoked; and driving without insurance. Even if Defendant's charges were not directly related to the stop, they were offenses subsequently discovered during Defendant's encounter with the officers. Defendant's erratic driving was not unrelated to the subsequent discovery of his other charges. *Leyva*, 2011-NMSC-009, ¶ 23 (holding that "[a]n officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that

15

criminal activity unrelated to the stop is afoot" (internal quotation marks and citation omitted)).

The second factor is "the officer's compliance or non-compliance with standard police practices[.]" *Ochoa II*, 2009-NMCA-002, ¶ 41. No testimony was elicited to suggest that either officer failed to comply with standard police practices.

The third and fourth factors are "whether the officer was in an unmarked car or was not in uniform" and "whether patrolling or enforcement of the traffic code [was] among the officer's typical employment duties[.]" *Id.* On the night in question, Officer Brown testified that he was conducting routine patrol in his unmarked assigned unit. Enforcement of the traffic code fell within his employment duties.

The fifth factor is "whether the officer had information, which did not rise to the level of reasonable suspicion or probable cause, relating to another offense[.]" *Id.* Officer Brown's observations stated in his testimony provide both officers with reasonable suspicion to believe Defendant was driving while under the influence. Specifically, the information included: (1) Defendant was consistently driving five miles per hour below the speed limit; (2) Defendant was weaving within his lane of traffic; (3) Defendant was taking a side road out of town that ran parallel to the main road; and (4) Defendant drove half way out of his lane of traffic and onto the shoulder. Once Defendant was stopped, the reason behind Defendant's erratic driving became

apparent. Defendant exhibited familiar signs of intoxication and failed the three sobriety tests administered by Officer Carey.

The sixth and seventh factors are "the manner of the stop, including how long the officer trailed . . . [D]efendant before performing the stop, how long after the alleged suspicion arose or violation was committed the stop was made, how many officers were present for the stop" and "the conduct, demeanor, and statements of the officer during the stop[.]" *Id.* Officer Brown testified that he followed Defendant for approximately three miles, during which time he observed Defendant weave within his lane of traffic, drive under the speed limit, and drive his vehicle half way out of his lane and onto the shoulder. Although Officer Brown believed that Defendant was driving while under the influence, he further testified that he waited to pull Defendant over until he had probable cause and not just reasonable suspicion. Officers Carey and Brown were present during the traffic stop. However, unlike the facts in *Ochoa II*, there was no evidence that either Officer Brown or Carey questioned Defendant about matters unrelated to his driving.

The eighth factor concerns Defendant's "relevant characteristics." *Id.* Defendant had a strong odor of alcohol, his eyes were watery, and his speech was slightly slurred. This factor demonstrates the reasonableness of the decision to conduct a DWI investigation.

The ninth factor is "whether the objective reason articulated for the stop was necessary for the protection of traffic safety." *Id.* Defendant's erratic driving posed a danger to himself and to others on the roadway.

The tenth factor is the "officer's testimony as to the reason for the stop." *Id.* Officer Carey stopped Defendant for failure to maintain his lane. Officer Brown wanted Defendant stopped to investigate why Defendant failed to maintain his lane of traffic and to investigate his reasonable suspicion that Defendant was driving while under the influence of intoxicating alcohol or drugs. Unlike the facts in *Ochoa II*, there was no evidence that Officer Carey was asked to perform a stop of Defendant's vehicle so that a matter unrelated to Defendant's erratic driving could be investigated.

The totality of the circumstances in this case indicates that there was no unrelated motive; rather, the motive throughout the entire encounter was a belief that Defendant was under the influence of alcohol or drugs. Therefore, the officer's initial motive for following the vehicle matched the "objective existence of reasonable suspicion." *Cf. id*. ¶¶ 40, 43-46 (holding a stop to be pretextual when the stop was initiated to investigate the defendant's involvement in drug activity, a motive unrelated to the seatbelt violation that was the objective justification for the stop). Accordingly, Defendant has failed to establish a rebuttable presumption that the stop was pretextual.

**SUFFICIENCY OF THE EVIDENCE**

**Standard of Review**

Defendant next argues that the State presented insufficient evidence that Defendant was driving while impaired by alcohol. In reviewing a claim of insufficient evidence, this Court must determine "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Wildgrube*, 2003-NMCA-108, ¶ 3, 134 N.M. 262, 75 P.3d 862 (internal quotation marks and citation omitted). In applying this standard, this Court "review[s] the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Rudolfo*, 2008-NMSC-036, ¶ 29, 144 N.M. 305, 187 P.3d 170 (internal quotation marks and citation omitted). In reviewing the evidence, the relevant question is whether "*any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). The reviewing court does not

substitute its judgment for that of the jury: "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. Nor will this Court "evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted).

Defendant was convicted of DWI under Section 66-8-102(A), which reads "[i]t is unlawful for a person who is under the influence of intoxicating liquor to drive a vehicle within this state." Our case law and our Supreme Court's Uniform Jury Instruction have phrased this statutory language as follows:

> A person is under the influence of intoxicating liquor if as a result of drinking liquor [the driver] was less able to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to [the driver] and the public.

*State v. Sanchez*, 2001-NMCA-109, ¶ 6, 131 N.M. 355, 36 P.3d 446 (alteration in original) (internal quotation marks and citation omitted).

This Court has upheld convictions under the foregoing standard in cases analogous to the one at hand. *See State v. Soto*, 2007-NMCA-077, ¶¶ 3, 4, 34, 142 N.M. 32, 162 P.3d 187 (holding that there was sufficient evidence of DWI under the

impaired-to-the-slightest-degree standard even though the officers observed no irregular driving, the defendant's behavior was not irregular, he was cooperative, and no field sobriety tests were conducted, given that the defendant "had red, bloodshot, and watery eyes, as well as slurred speech and a very strong odor of alcohol on his breath[,]" the defendant admitted drinking, the officers observed several empty cans of beer where the defendant had been, and the officer opined that the defendant was intoxicated); *State v. Gutierrez*, 1996-NMCA-001, ¶ 4, 121 N.M. 191, 909 P.2d 751 (holding that there was sufficient evidence to convict under Section 66-8-102(A) when the defendant "was weaving into other traffic lanes; [the d]efendant narrowly missed hitting a truck; [the d]efendant smelled of alcohol and had bloodshot, watery eyes; [the d]efendant failed three field sobriety tests; [the d]efendant admitted drinking alcohol and smoking marijuana; and the officers believed that [the d]efendant was intoxicated"); *State v. Ruiz*, 120 N.M. 534, 535, 540, 903 P.2d 845, 846, 851 (Ct. App. 1995) (upholding the district court's conclusion that there was sufficient evidence of DWI under the impaired-to-the-slightest-degree standard when the defendant's vehicle weaved out of its lane, the defendant had watery, bloodshot eyes, smelled of alcohol, had slurred speech, admitted drinking, and performed field sobriety tests with mixed results), *abrogated on other grounds by State v. Martinez*, 2007-NMSC-025, 141 N.M. 713, 160 P.3d 894.

Defendant argues that Officer Carey did not see any traffic violations whatsoever and that Officer Brown followed Defendant for miles through Bloomfield and into Aztec and did not observe any traffic violations. Additionally, Defendant argues that Officer Brown's testimony that Defendant swerved into the shoulder as they were entering Aztec was not credible, as evidenced by the jury's acquittal, and that none of the other observations testified to by Officer Brown were illegal or dangerous. Moreover, Defendant argues that the officers' testimony describing Defendant's performance on the field sobriety tests and his driving are of minimal probative value on the issue of impairment because they are equally consistent with not being impaired. Thus, Defendant argues that the evidence presented was insufficient to prove Defendant's driving was impaired to the slightest degree.

As we have discussed, the district court had before it Officer Brown's and Officer Carey's observations of Defendant's erratic driving, his appearance, and his behavior. The jury heard evidence that Defendant was initially weaving within his lane of traffic, driving five miles under the posted speed limit, and drove his vehicle half way out of his lane of traffic into the shoulder and back. The jury also heard evidence that Defendant exhibited the familiar signs of intoxication that included having a strong odor of alcohol, watery eyes, and slurred speech. The jury considered the evidence about Defendant's poor performance of the field sobriety tests, that he

refused to comply with the ICA, and that he was combative at the hospital.

Given the evidence, the factfinder could rely on common knowledge and experience to determine whether Defendant was under the influence of alcohol. *See State v. Baldwin*, 2001-NMCA-063, ¶ 16, 130 N.M. 705, 30 P.3d 394 (pointing out that a factfinder can rely on "human experience" in deciding whether a defendant was under the influence and could "drive an automobile in a prudent manner"). This Court recognizes that it is for the factfinder to resolve any conflict in the testimony of witnesses and to determine where the weight and credibility lay. *State v. Salas*, 1999-NMCA-099, ¶ 13, 127 N.M. 686, 986 P.2d 482.

Viewing all the evidence in the record in a light most favorable to the verdict, a rational jury could draw reasonable inferences that Defendant was the driver of the vehicle and that he was less able "to the slightest degree . . . to exercise the clear judgment . . . necessary to handle a vehicle." *Sanchez*, 2001-NMCA-109, ¶ 6 (internal quotation marks and citation omitted). The jury resolved conflicts in the evidence and questions of credibility in favor of guilt, thereby rejecting Defendant's argument that he was driving safely. Defendant's conviction of DWI is supported by sufficient evidence in the record.

**INEFFECTIVE ASSISTANCE OF COUNSEL**

In a separate hearing on December 15, 2009, Defendant informed the court of

23

some of the issues he was having with his attorney, including disclosure of what he believed to be privileged information. The court did not find that Defendant's rights had been violated. During the trial on January 12, 2010, defense counsel informed the court that he and Defendant were having a disagreement about whether to play the DVD from Officer Brown's dashboard camera. Defendant believed that because it did not show that he was unable to maintain his lane, the jury would see that the officer did not have probable cause to stop him. The court explained that probable cause is not a jury question and that the question of probable cause had been decided at the suppression hearing. The court ultimately decided that it was a tactical decision for defense counsel to make. Prior to sentencing, Defendant and defense counsel informed the court that Defendant was dissatisfied with his counsel.

The framework for evaluating a claim of ineffective assistance of counsel is well established. Following *Strickland v. Washington*, 466 U.S. 668 (1984), we require Defendant to show, first, that his counsel's performance was deficient and, second, that this deficiency prejudiced his defense. *Lytle v. Jordan*, 2001-NMSC-016, ¶ 25, 130 N.M. 198, 22 P.3d 666. The burden remains with Defendant to establish each element. *Id.* When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record. *Cf. State v. Telles*, 1999-NMCA-013, ¶ 25, 126 N.M. 593, 973 P.2d 845 ("Without a record, we cannot consider [the

24

d]efendant's claim of ineffective assistance of counsel on direct appeal."). If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance. *See State v. Martinez*, 1996-NMCA-109, ¶ 25, 122 N.M. 476, 927 P.2d 31; *State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct. App. 1992). In this case, there is no need to remand the case because all of the facts necessary to evaluate the claim are part of the record on appeal.

Defense counsel's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Lytle*, 2001-NMSC-016, ¶ 26 (internal quotation marks and citation omitted). In determining whether a particular counsel's performance was deficient, an appellate court should presume that the performance fell within a "wide range of reasonable professional assistance." *Id*. (internal quotation marks and citation omitted). "Indeed, if on appeal we can conceive of a reasonable trial tactic which would explain the counsel's performance, we will not find ineffective assistance." *State v. Roybal*, 2002-NMSC-027, ¶ 21, 132 N.M. 657, 54 P.3d 61.

Defendant's ineffective assistance of counsel claim is based on three grounds. First, Defendant asserts that trial counsel was ineffective because counsel failed to

introduce and show the jury the DVD introduced during the suppression hearing as State's Exhibit 1. Defendant claims that the DVD from the dashboard camera did not show any traffic violations by Defendant, as admitted by Officer Brown. When the issue of the DVD arose at trial, defense counsel informed the district court that he reviewed the video, that the video was vague and ambivalent, and that he did not believe the video would help Defendant. The record supports the finding that defense counsel's conduct was based on strategy, thus this claim is insufficient to support Defendant's position. *See id.*

The second ground upon which Defendant bases his ineffective assistance of counsel claim concerns the fact that counsel did not explore the inconsistencies within the officers' testimony, including the distance between the two cities, the location where Officer Carey was waiting, and the location of the stop. However, Defendant has not cited record evidence to support how the officers' testimony was inconsistent. *See Santa Fe Exploration Co. v. Oil Conservation Comm'n,* 114 N.M. 103, 108, 835 P.2d 819, 824 (1992) (stating that we will not consider arguments based on factual allegations that are unsupported by citation to the record). Thus, we decline to consider this argument.

The third ground upon which Defendant bases his ineffective assistance of counsel claim is that defense counsel did not call Defendant's witnesses regarding the

preliminary hearing. The decision to call a witness is a matter of trial tactics and strategy. *State v. Harrison*, 2000-NMSC-022, ¶ 63, 129 N.M. 328, 7 P.3d 478. Therefore, a prima facie case has not been established as to this claim.

Finally, Defendant asserts that his trial attorney was unable to provide effective representation because the attorney-client relationship had broken down, as evidenced by the record. Defendant has not shown how the break down in the attorney-client relationship prejudiced his defense. A prima facie case of ineffective assistance of counsel is not shown on mere speculation of prejudice. *See In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 10, 121 N.M. 562, 915 P.2d 318 ("An assertion of prejudice is not a showing of prejudice.").

**CONCLUSION**

For the foregoing reasons, this Court affirms Defendant's convictions.

**IT IS SO ORDERED.**

_____
**JAMES J. WECHSLER, Judge**

**WE CONCUR:**

_____

**CELIA FOY CASTILLO, Chief Judge**

_____

**JONATHAN B. SUTIN, Judge**